**CORRECTED**

# In the United States Court of Federal Claims

No. 24-1204

Filed: April 16, 2025[*]

NOT FOR PUBLICATION

---

**INTELLIBRIDGE, LLC, et al.,**

        ***Plaintiffs,***

**v.**

**UNITED STATES,**

        ***Defendant.***

---

*Hamish Hume*, Boies Schiller & Flexner LLP, Washington, DC, with *Samuel C. Kaplan* and *Gina A. Rossman*, of counsel, for the plaintiffs.

*William Porter Rayel*, Civil Division, Commercial Litigation Branch, U.S. Department of Justice, Washington, D.C., for the defendant.

## MEMORANDUM OPINION

***HERTLING*, Judge**

IntelliBridge, LLC and its subsidiary, RevaComm, Inc. ("IntelliBridge" or "the plaintiff"), filed suit under 28 U.S.C. § 1491(b)(1) challenging the issuance by the Centers for Medicare and Medicaid Services ("CMS") of Request for Quotation No. 75FCMC24Q0011 ("RFQ") for the CMS Hybrid Cloud Product Engineering & Operations procurement ("PEO contract"). CMS had previously used the plaintiff's batCAVE platform to assist in the onboarding of software applications ("apps") onto the CMS information-technology system by ensuring that the apps meet the government's cybersecurity requirements. IntelliBridge alleged that, in issuing the RFQ, CMS had violated 41 U.S.C. § 3307 ("section 3307"), a statute requiring agencies to conduct market research and to give a preference to commercial products and services in procuring goods and services, by seeking a developmental solution instead of acquiring the batCAVE platform to perform the required task.

---

[*] Pursuant to the protective order in this case, this opinion was under seal on April 14, 2025, and the parties were directed to propose redactions of confidential or proprietary information. The parties have reported that no redactions are necessary. Accordingly, the opinion is released in full.

On February 10, 2025, the protest was dismissed after the Court concluded that the RFQ did not seek a developmental solution that would replicate the functionality of the batCAVE platform, but instead sought cloud computing and IT-management services. Thus, CMS had complied with section 3307 and appropriately conducted its market research on the services it sought to procure. *See IntelliBridge, LLC v. United States*, 174 Fed. Cl. 793 (2025).

On March 10, 2025, the plaintiff filed a timely motion under Rule 59(a) of the Rules of the Court of Federal Claims for reconsideration of the judgment. (ECF 52.) The plaintiff argues that the ruling is premised on an argument not made by the defendant and, as a result, should have been considered forfeited, or, alternatively, the plaintiff should have been given the opportunity to address the argument in supplemental briefing. Additionally, the plaintiff argues that the ruling conflicts with the plain meaning of 41 U.S.C. § 3307 and must be vacated. The defendant opposes the motion. (ECF 55.)

## I.    BACKGROUND

### A.    Factual Background

The facts are recited in detail in the opinion rejecting the plaintiff's claim and will only be summarized here. *See IntelliBridge,* 174 Fed. Cl. at 797-806.

CMS, a component of the Department of Health and Human Services, provides healthcare coverage and support for beneficiaries enrolled in Medicare, Medicaid, and other health care programs. The Infrastructure and User Services Group of CMS's Office of Information Technology ("OIT") "supports the CMS cloud infrastructure by provisioning, maintaining and supporting applications serving CMS's beneficiaries." (AR 17.)

In September 2021, CMS awarded RevaComm a Small Business Innovation Research ("SBIR") Indefinite Delivery, Indefinite Quantity contract. (AR 1879.) Under that contract, RevaComm was, among other things, to develop a Platform as a Service ("PaaS") "to support more rapid development of secure and usable systems." (AR 1890.) RevaComm used its SBIR contract to develop the batCAVE platform "to assist in the development, security, and operation ("DevSecOps") of software apps that are onboarded onto the CMS system, including by automating much of the process for ensuring software apps meet the [g]overnment's stringent cybersecurity requirements." (AR 1890; ECF 27-1 at 2.) The batCAVE platform also includes "a curriculum to facilitate onboarding onto CMS's information systems." (ECF 27-1 at 3.)

In September 2022, CMS issued a task order to IntelliBridge under the SBIR contract to deploy the batCAVE platform to provide onboarding services for app developers and to integrate developer apps with CMS systems. (AR 1759.) In the spring of 2024, however, CMS decided to discontinue using the batCAVE platform because, according to internal CMS emails, CMS app developers had not widely adopted it. (AR 1271.) CMS also determined that it could migrate Application Delivery Organizations ("ADOs") from the batCAVE infrastructure to an alternative existing infrastructure. (AR 1286-89.)

Separately, in November 2022, CMS began to develop an acquisition strategy for infrastructure and end-user services. (AR 11.001.) The scope of the acquisition strategy included "providing for day-to-day operations and maintenance activities of CMS'[s] enterprise-wide infrastructure, including managing the mainframe, backing up CMS'[s] mission critical applications, and providing support to 6,500 CMS employees." (*Id*.) On April 11, 2024, as part of this acquisition strategy, CMS decided to proceed with the acquisition of the PEO contract and produced a draft Statement of Objectives ("SOO") for that acquisition. (AR 12.) The draft SOO noted that the "[c]ontractor will work with CMS and the other contractor teams . . . as one team (integrated partners) to collaborate and jointly realize OIT's product vision." (*Id*.) The batCAVE platform was listed in the SOO as one of the contracts "directly support[ing] the CMS Cloud and Hybrid Cloud Program." (AR 20-21.) The SOO described the batCAVE contract as "support[ing] software and systems development for [the] batCAVE platform and supporting products, including platform instrumentation, continuous integration and deployment pipelines, and continuous authorization support." (AR 21.)

To conduct market research before issuing the RFQ, CMS issued on April 22, 2024, a Request for Information ("RFI") (AR 48-51), to which the draft SOO was attached. (AR 12-47.) The RFI was posted to the General Services Administration ("GSA") e-buy website under two categories: Information Technology Professional Services and Cloud Computing and Cloud Related Information Technology. (AR 587, 590.) Responses to the RFI were due May 6, 2024. (AR 48.) IntelliBridge, along with 47 other vendors, responded to the RFI by the closing date. (AR 591.)

In its response to the RFI, IntelliBridge described its batCAVE platform as "a secure PaaS which can be deployed on-premises or in the cloud" and which can "assist application teams utilizing these data centers and hybrid cloud environments to modernize and deploy their applications to a cloud-native state." (AR 295.) IntelliBridge also claimed that it had "significant experience providing the services listed in the . . . SOO, including cloud services" and could "actively demonstrate[ ]" its cloud service experience through RevaComm's "work on the . . . batCAVE program for CMS." (AR 294.)

Based on the 48 responses, CMS prepared a Market Research Report ("MRR") for the PEO contract. The MRR was issued on June 6, 2024. (AR 587.) It explained that "[t]he objective of th[e] effort is to obtain, *design*, build, operate, maintain, refine, modernize, and evolve all cloud services, agile software, and network infrastructure, and products and services required to deliver consumable CMS cloud infrastructure services for CMS customers." (AR 589.) (Emphasis added.) The MRR concluded that there is "a large interest in this requirement and several opportunities for subcontractor involvement," but that several respondents that "appeared to have some understanding of the PEO requirements [ ] were not necessarily equipped to manage the contract without assistance." (AR 588.) CMS determined that only four of the respondents "demonstrated the capability of providing support and understanding of the requirements based on the response to all questions," and a fifth vendor was deemed "borderline capable." (AR 592.)

IntelliBridge was not one of the five respondents deemed capable or borderline capable. CMS rated IntelliBridge's responses to the RFI as "low" and determined that IntelliBridge was "not capable." (AR 586.) IntelliBridge was also listed as an "other than small business." (*Id*.)

The MRR concluded that "based on the information received, [CMS] will be able to obtain three or more acceptable quotes" from small businesses and, accordingly, "set [the contract] aside for small businesses." (AR 589.) IntelliBridge is not a small business, and CMS therefore did not evaluate each element of IntelliBridge's response to the RFI. CMS also determined that "[b]ased on market research, [the PEO contract] could be considered an acquisition of commercial items in the form of professional services delivered on an hourly basis using labor categories specified in a price list." (AR 595.)

On July 1, 2024, CMS published a streamlined acquisition plan detailing its solicitation requirements, procurement history, performance requirements, risks, and procurement requirements. (AR 606.) The acquisition plan noted that the acquisition was set aside for small businesses and that it would be conducted under FAR part 37. (AR 618, 629.) On July 11, 2024, CMS issued the RFQ under FAR 8.405 for GSA Multiple Award Schedule contract holders for commercial cloud services as a "100% set aside for small business participants." (AR 1209.)

## B.    The Court's Decision

### 1.    Factual Determinations

The initial question addressed in the opinion was whether CMS was seeking to procure a product that performs the same or a similar functionality as the batCAVE platform and, if so, whether CMS was procuring that functionality through a developmental solution rather than acquiring the batCAVE platform. IntelliBridge was found to have failed to meet its burden to demonstrate, as a factual matter, that the RFQ sought a product that replicates the functionality of the batCAVE platform. Instead, CMS was found to be seeking a broad suite of cloud-computing and IT-management services that it will acquire through an existing, commercially available solution.

To come to its conclusion, the Court compared the batCAVE platform with the RFQ, RFI, and MRR. The Court found that while "portions of the RFI and the final SOO [ ] appear to seek services that parallel the batCAVE platform's functionality," *IntelliBridge*, 174 Fed. Cl. at 809, the "similarities between the services sought by the RFQ and the functionality of the batCAVE platform . . . make up only a modest and relatively insignificant portion of the RFQ and the related SOO, MRR, and RFI when viewed as a whole." *Id*. at 810. The language used in the draft SOO, MRR, and RFI was broad and supported the "claim that the contract is for wholistic IT-management services and not just the [ ] service provided by the batCAVE platform." *Id*. In other words, "the RFI's language is more comprehensive than the description of the functionality of the batCAVE platform." *Id*.

After comparing the batCAVE platform with the record of the solicitation, the Court concluded that:

the RFQ, when read in its entirety, is not seeking to replicate the batCAVE platform's functionality. Instead, CMS is seeking a much broader IT- and cloud-management-services contract. Application onboarding and [authorizations-to-operate] compliance is only a small part of the broader set of requirements of the PEO contract. The contract instead envisions a managerial role across CMS components and contractors that the batCAVE platform does not provide. IntelliBridge's conception of the PEO contract is misaligned with the reality that CMS is seeking to award a contract that can wholistically meet the full scope of the agency's cloud-computing needs. It is true that the RFQ does on its face anticipate the need for some developmental solutions, but these products or services are a small subset of the overall procurement. The batCAVE platform is unable to provide most of these services and any overlap is too limited to conclude that the RFQ seeks merely a developmental solution to replicate the batCAVE platform. Thus, CMS is seeking to procure commercial services, not a developmental solution as the plaintiff asserts.

*Id*. at 812.

### 2.  The Market Research Satisfied Section 3307

CMS's market research was found to have "appropriately targeted" the services CMS is seeking to acquire and "revealed that existing providers of commercial services were available to meet the agency's requirements." *Id.* Further, CMS "properly documented its conclusions in the MRR." *Id*.

Reviewing the RFI, the MRR, and the responses to the RFI, the Court concluded:

The MRR determined that the PEO contract's objective would be "to obtain, design, build, operate, maintain, refine, modernize, and evolve all cloud services, agile software, and network infrastructure, and products and services required to deliver consumable CMS cloud infrastructure services for CMS customers." (AR 589.) CMS concluded that "[b]ased on market research, [the PEO contract] could be considered an acquisition of commercial items in the form of professional services delivered on an hourly basis using labor categories specified in a price list." (AR 595.) CMS also determined that "based on the information received, [CMS] will be able to obtain three or more acceptable quotes" from small businesses. (AR 589.) As a result of its market research, CMS "set [the contract] aside for small businesses." (*Id*.)

*Id*. at 813.

Thus, CMS's market research satisfied the requirements imposed by section 3307. *Id.*

### 3. Prejudice

Finally, it was found that "[e]ven if CMS had failed to comply with section 3307, the plaintiff [was] unable to show prejudice, as the batCAVE platform cannot meet the requirements set out by the RFQ." *Id.* at 815. Additionally, CMS's requirement that the awardee comply with section 3307 prevented the plaintiff from being harmed at this stage of the procurement. *Id.*

Based on the factual findings and the absence of prejudice to IntelliBridge, the plaintiff's motion for judgment on the administrative record was denied, and the defendant's cross-motion for judgment on the administrative record was granted. The plaintiff now seeks reconsideration of that decision, arguing that the Court's conclusion is "wrong as a matter of law." (ECF 52 at 5.)

## II.    STANDARD OF REVIEW

"Under Rule 59(a)(1), a court, in its discretion, may grant a motion for reconsideration when there has been an intervening change in the controlling law, newly discovered evidence, or a need to correct clear factual or legal error or prevent manifest injustice." *Biery v. United States*, 818 F.3d 704, 711 (Fed. Cir. 2016) (cleaned up).

"Reconsideration of a judgment is not intended to permit a party to retry the allegations included in plaintiff's complaint when it previously was afforded a full and fair opportunity to do so." *Hymas v. United States*, 141 Fed. Cl. 735, 738 (2019); *see also Principal Mut. Life Ins. Co. v. United States*, 29 Fed. Cl. 157, 164 (1993), *aff'd*, 50 F.3d 1021 (Fed. Cir. 1995) (no grounds for reconsideration if movant "merely reasserts…arguments previously made[,] . . . all of which were carefully considered"). Rule 59 does not provide an opportunity to "relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) (cleaned up); *see also Hymas*, 141 Fed. Cl. at 738; *Ammex, Inc. v. United States*, 52 Fed. Cl. 555, 557 (2002); *Principal Mut. Life Ins. Co.*, 29 Fed. Cl. at 164. Given its limited purpose, a "[m]otion[ ] for reconsideration must be supported by a showing of extraordinary circumstances which justify relief." *Caldwell v. United States*, 391 F.3d 1226, 1235 (Fed. Cir. 2004) (cleaned up).

## III.    DISCUSSION

### A.    Plaintiff's Argument

The plaintiff argues that the ruling implicitly rests on a conclusion the plaintiff terms the "bundling proposition." (ECF 52 at 5.) According to the plaintiff, this implicit "bundling proposition" rests on a conclusion that:

> when an agency issues a solicitation that seeks both (a) to meet certain needs through the procurement of nondevelopmental, commercial services, and (b) to meet at least a small percentage of

its needs through a developmental project that seeks to replicate the functionality of a commercial or nondevelopmental product, the agency does not need to:

- Do any market research regarding the availability of the commercial or nondevelopmental product to meet the needs described in (b);

- Make determinations regarding the practicability of acquiring any such commercial or nondevelopmental product to meet the needs addressed in (b); and

- Favor the acquisition of such commercial or nondevelopmental product over a developmental project to meet the needs addressed in (b).

(*Id.* at 4-5.)

The plaintiff acknowledges that "the Court's opinion does not express its conclusion in the precise terms of this [b]undling [p]roposition." (*Id.* at 5.) Based on its inference that the decision necessarily relied on its proposed "bundling proposition," however, the plaintiff seeks reconsideration of the ruling for two reasons.

First, the plaintiff argues that because the defendant did not make the argument on which the Court allegedly made its decision, the argument should have either been waived, or the plaintiff should have been given an opportunity to provide supplemental briefing on the issue.

Second, the plaintiff argues that the bundling proposition is "inconsistent with the overarching goal and plain meaning of 41 U.S.C. § 3307." (*Id.* at 8.) IntelliBridge argues that the purpose of section 3307 "is to prohibit unnecessary and wasteful development regardless of whether it occurs as part of a larger contract." (*Id.*) IntelliBridge claims this purpose would be defeated if an agency could combine the procurement of a nondevelopmental commercial service with the procurement of a developmental service to "avoid the need to (i) do any research regarding the availability of a commercial or nondevelopmental product that meets the needs of the developmental project; (ii) make determinations regarding the practicability of acquiring such products, or (iii) actually procure such products where practicable." (*Id.* at 9.)

**B.      The Factual Issue Was Raised and Addressed by the Parties**

The plaintiff begins by arguing that it did not have the opportunity to brief the so-called bundling proposition because the defendant did not argue the point. The plaintiff fundamentally misunderstands its obligation to prove its case. In a bid protest, the court conducts a trial on a paper record. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1353-56 (Fed. Cir. 2005). The burden rests with the protester to show that the agency acted in an arbitrary and capricious manner and/or illegally, and that the protester suffered prejudice due to the agency's improper or illegal actions. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1337 (Fed. Cir. 2001) ("the burden of establishing arbitrary and capricious action rests on the disappointed bidder"); *see also Sys. Studies & Simulation, Inc. v. United States*, 22 F.4th 994,

998 (Fed. Cir. 2021) ("[T]here is no presumption of prejudice . . . [t]he protestor must show prejudice under the usual standard."). It is the plaintiff that must prove its case in the first instance. Here, the burden was on IntelliBridge to prove its case. That case depended on showing that CMS sought to acquire what IntelliBridge offered; the burden is not on the defendant to show the opposite. Any failure by the defendant to make an argument along this line is irrelevant, as the plaintiff's own proof failed to support its case.

An analogy may be helpful. Consider that CMS issued a solicitation to acquire automobiles, and IntelliBridge makes tires, a critical component of any vehicle. The solicitation also requires the carmaker to comply with section 3307 in sourcing components, like tires. If IntelliBridge challenged that solicitation, it has the burden of showing that it can supply what CMS is seeking to acquire. If it omits the fact that it only makes tires, and the defendant does not explicitly make the argument that the plaintiff does not make complete vehicles but only tires, the plaintiff's failure to engage with the argument that it does not make entire vehicles reflects a failure of the plaintiff to meet its basic burden.

In any event, the plaintiff is incorrect that the defendant did not make an argument as to the scope of the RFQ. To begin, IntelliBridge itself first placed at issue the question of what CMS seeks to procure, as required to satisfy its burden. IntelliBridge argues that it "has a fully-developed software product (known as 'batCAVE') that provides the 'platform-as-a-service' functions that CMS is now seeking to replicate with its CMS Hybrid Cloud Contract procurement." (ECF 27 at 7.) In response, the defendant contested IntelliBridge's claim, arguing that "CMS's PEO RFQ is not seeking to build a new DevSecOps platform, much less one that replicates batCAVE's SEC or accelerated [authorizations to operate] approval functionality." (ECF 28 at 35.) The defendant proceeded to argue that "CMS is not seeking to reprocure the batCAVE, but, instead, seeks commercial cloud engineering and operations services." (*Id*.) The parties disputed and briefed the predicate factual issue in the case, and the factual question was extensively discussed during oral argument. IntelliBridge's complaint that it did not have the chance to address this basic factual issue is frivolous. The decision was based on a basic factual issue that the plaintiff had the burden to address in the first instance. The plaintiff did so, and the defendant responded. The plaintiff simply failed to prove an essential element of its claim. Reconsideration is not warranted.

### C.    The Decision is Consistent with Section 3307

The plaintiff's argument that the decision is inconsistent with the text and purpose of section 3307 is unfounded. IntelliBridge argues that the purpose of section 3307 is to "prohibit unnecessary and wasteful development regardless of whether it occurs as part of a larger contract" (ECF 52 at 8), and this purpose would be undermined if an agency could combine the procurement of developmental and nondevelopmental services into a single procurement to circumvent the requirements of section 3307. That issue was not, however, presented by IntelliBridge's protest and was not addressed in the opinion.

IntelliBridge's protest presented a dispute about the products and/or services CMS was seeking to acquire through the RFQ, and whether CMS sought to replicate the batCAVE platform through that acquisition. Even assuming the plaintiff's reading of section 3307 is

8

correct, the facts here reflect that CMS was not hiding the development of a replica of the batCAVE platform or its functionality in a nondevelopmental solicitation. CMS is not seeking to acquire what the batCAVE platform does but is instead seeking to acquire a much larger suite of services, of which the functionality of the batCAVE platform is just a small subset.

The so-called "bundling proposition" raises a strawman argument, and the previous decision did not rely upon it. Instead, the decision rested on a factual determination that CMS was not seeking to replicate the batCAVE platform's functionality in its solicitation; that issue was a fundamental element of the claim. Based on this finding, CMS was not required to do market research on a product that it was not seeking to acquire. Specifically, the record supported the finding that "CMS is seeking a much broader IT- and cloud-management-services contract" that "envisions a managerial role across CMS components and contractors that the batCAVE platform does not provide." *IntelliBridge*, 174 Fed. Cl. at 812. Any overlapping functionality covered only "a small subset of the overall procurement." *Id.* By the nature of their shared subject matter, the services sought under the PEO contract and the batCAVE platform necessarily share some overlapping functionality. Such overlap, however, is insufficient to conclude that CMS is "seeking to acquire what IntelliBridge is looking to sell." *Id.* at 797.

## IV.    CONCLUSION

The plaintiff has not demonstrated any errors of fact or law in the original decision.[1] Rather, it concocts an inferred conclusion that does not reflect what was decided after briefing and argument. IntelliBridge has failed to demonstrate that a clear error must be corrected. Instead, the plaintiff expresses a mere disagreement with the Court's decision. The Rule 59 motion raises no "intervening change in the controlling law, newly discovered evidence, or a need to correct clear factual or legal error or prevent manifest injustice." *Biery*, 818 F.3d at 711. The plaintiff has not established an entitlement to have the decision rejecting its claim reconsidered. The plaintiff's motion for reconsideration (ECF 52) is **DENIED**.

It is so **ORDERED**.

s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**

---

[1] The defendant points out that the Rule 59 motion does not challenge the conclusion that the plaintiff did not demonstrate it had suffered any prejudice. The defendant argues that because a showing of prejudice is required to support relief in a bid protest, the plaintiff's failure to challenge the absence-of-prejudice conclusion dooms the Rule 59 motion. The conclusion that the plaintiff had not shown prejudice was based on the factual findings the plaintiff does challenge in its Rule 59 motion. If those findings were reconsidered, the prejudice prong would necessarily be subject to reconsideration. Accordingly, that aspect of the defendant's argument is rejected.